Peter Johnson (State Bar  No. 252542)
Law Office of Peter Johnson
409 N. Pacific Coast Hwy, 651
Redondo Beach, California 90277
Telephone: (310) 295-1785
Facsimile: (866) 941-7715
Email: peter@peterjohnsonlaw.com

Arthur H. Barens (State Bar No. 43215)
LAW OFFICE OF ARTHUR H. BARENS
10209 Santa Monica Boulevard
Los Angeles, California 90067
(310) 557-0444 Telephone
(310) 557-1432 Facsimile
Email: barens@barenslaw.com

Attorneys for Defendant
LUIS AGUINAGA

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>LUIS AGUINAGA,<br><br>　　　　　Defendant. | Case No. CR-16-00521-FMO<br><br>**SENTENCING MEMORANDUM FOR MR. LUIS AGUINAGA**<br><br>**Sentencing Date:  January 19, 2016**<br>**Sentencing Time: 2:00 PM** |

　　　　Defendant Luis Aguinaga, through his counsel of record, Peter Johnson and Arthur H. Barens, hereby requests the Court to impose a sentence of probation that includes home incarceration and community service as a fair and reasonable

//

1  sentence in this case. The request is supported by the attached sentencing

2  memorandum.

3

4

5  DATED:  January 9, 2017              Respectfully submitted,

6

7  By: _____/s/_____
   PETER JOHNSON

8  Attorney for Defendant LUIS AGUINAGA

9

10  _____/s/_____
    ARTHUR H. BARENS

11  Attorney for Defendant LUIS AGUINAGA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF CONTENTS

**SENTENCING MEMORANDUM**                                                     **PAGE NO.**

  I.     Introduction ...................................................................................1

  II.    Advisory Sentencing Guidelines……………………………….…..2

  III.   Sentencing Factors Under 18 U.S.C. § 3553(a)…………………….…2

        A. *The Mitigating Factors Regarding The Nature and Circumstances of the Offense Support a Downward Variance from the Advisory Guideline Sentencing Range…………………………………………3*

        B. *Mr. Aguinaga's Personal and Professional History and Characteristics Form the Basis for a Downward Variance from the Advisory Guideline Sentencing Range……………………………..5*

            (i)   *Mr. Aguinaga's Personal History and Characteristics……………………………………..5*

            (ii)  *Mr. Aguinaga's Professional History and Characteristics……………………………………..9*

        C. *A Sentence of Probation That Includes Home Incarceration and Community Service Would Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence To Criminal Conduct……………………………………………11*

        D. *A Sentence of Probation That Includes Home Incarceration and Community Service Would Address The Need for the Sentence Imposed to Protect the Public From Further Crimes………………………………………………………..14*

        E. *A Sentence of Probation That Includes Home Incarceration and Community Service Will Address the Need for the Sentence Imposed To Provide Mr. Aguinaga with Needed Medical Care in the Most Effective Manner……………………………….…15*

        F. *A Sentence of Probation That Includes Home Incarceration and Community Service Will Allow Mr. Aguinaga to Continue to Be A Father to His 10-Year-old Daughter and Continue Caring for His Aging Mother-in-Law……………………….…15*

G.  *In Determining the Kinds of Sentences Available,*
*A Sentence of Probation That Includes Home Incarceration and*
*Community Service is an Available Sentence*……………………...17

H. *A Sentence of Probation That Includes Home Incarceration and*
*Community Service Will <u>NOT</u> Create a Sentencing Disparity*…….17

IV.   CONCLUSION...........................................................................................19

## SENTENCING MEMORANDUM

**I.**     **Introduction**

On January 19, 2017, Mr. Aguinaga will appear before the Court for sentencing in this case. On September 1, 2016, Mr. Aguinaga pleaded guilty to violating 18 U.S.C. § 666(a)(1)(B), Bribery Concerning Programs Receiving Federal Funds. He accepts full responsibility for his conduct and is extremely remorseful.

On January 3, 2017, the government filed its sentencing position paper requesting a sentence of 46 months in prison.   Such a sentence is excessive, unnecessary and unreasonable. While such a sentence is "available" to the Court, it fails to take into account the factors the Court must consider under 18 U.S.C. § 3553 (a), including the non-violent nature of the offense, the low chance of recidivism and the absence of the need for a custodial sentence to protect the public.  Moreover, it neglects consideration of Mr. Aguinaga's dedicated service to the City of South El Monte and his family, and does not balance the mitigating factors of this case, including: 1) the Cooperating Witness initiated the payments, not Mr. Aguinaga; 2) the Cooperating Witness was the only person Mr. Aguinaga accepted payment from, as opposed to Mr. Aguinaga making a practice or career of accepting bribe payments from multiple people; 3) the Cooperating Witness warmed up to Mr. Aguinaga during a very difficult time in his life, when Mr. Aguinaga was going through a divorce;  4) the Cooperating Witness knew that community needs were at the forefront of Mr. Aguinaga's mind and used this to persuade Mr. Aguinaga to accept funds for charitable causes; 5) the majority of the payments were accepted by an unindicted public official, not Mr. Aguinaga; and 6) Mr. Aguinaga used a majority of the payments to fill the needs of charitable causes in the community.  The government also fails to discuss Mr. Aguinaga's personal history and characteristics, including a life-time of altruistic service that began well before he held public office, and the fact that that he demonstrated an early acceptance of responsibility by

admitting guilt and signing a plea agreement before the government went through the trouble of formally charging him by indictment.

At sentencing, undersigned counsel will respectfully request a sentence of probation as a fair and reasonable sentence in this case. Undersigned counsel requests that the term of probation include a term of home incarceration or home confinement, electronic monitoring and a significant number of hours of community service. As outlined below, such a sentence would reflect the seriousness of the offense, promote respect for the law, provide just punishment and afford adequate deterrence to criminal conduct, as required under 18 U.S.C. § 3553(a).

## II.   **Advisory Sentencing Guidelines**

On December 6, 2016, the U.S. Probation Office prepared a Presentence Report (PSR) with the following guideline calculations:

| | | |
|---|---|---|
| Base Offense Level: | 14 | (U.S.S.G. 2C1.1(a)(1)) |
| Specific Offense Characteristics: | +2 | (U.S.S.G. § 2C1.1(b)(1)) |
| Specific Offense Characteristics: | +6 | (U.S.S.G. § 2C1.1(b)(2)) |
| Specific Offense Characteristics: | +4 | (U.S.S.G. § 2C1.1(b)(3)) |
| Acceptance of Responsibility: | -3 | (U.S.S.G §3E1.1) |

**TOTAL OFFENSE LEVEL:        23**

The advisory sentencing range for an offense level 23, criminal history category I, is 46 to 57 months in prison. Mr. Aguinaga has reviewed the Presentence report and he has no objections to the advisory guideline calculation.

## III.   **Sentencing Factors Under 18 U.S.C. § 3553(a).**

In determining a sentence that is no greater than necessary to accomplish the purposes of sentencing, the Court must consider several "factors" listed in 18 U.S.C. § 3553(a):

• the nature and circumstances of the offense and the history and

2

characteristics of the defendant;

• The need for the sentence imposed --

    a.   To reflect the seriousness of the offense; to promote respect for the law, and to provide just punishment for the offense;

    b.   To afford adequate deterrence to criminal conduct;

    c.   To protect the public from further crimes of the defendant; and

    d.   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.;

• the kinds of sentences available;

• the Guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range;

• the need to avoid unwarranted sentencing disparity; and

• the need to provide restitution where applicable.

18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7).

Moreover, the Supreme Court has instructed that sentencing courts "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596 (2007) (*citing Rita v. United States*, 127 S. Ct. 2456 (2007)). Rather, a sentencing court must make an "individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. Along these lines, undersigned counsel presents the following information for the Court's consideration.

### A. The Mitigating Factors Regarding The Nature and Circumstances of the Offense Support a Downward Variance from the Advisory Guideline Sentencing Range.

First, Mr. Aguinaga did not initiate or suggest the bribe payment. Instead, the payment was the idea of a Cooperating Witness who solicited Mr. Aguinaga to accept the payment. (*See* Exhibit A). By no means does this mean that Mr. Aguinaga is avoiding responsibility for his own conduct. He understands that he was absolutely wrong to have accepted the payments. (*Id.*). However, the offense must be placed in context to show that, but for the Cooperating Witness soliciting him, Mr. Aguinaga would not have been involved in accepting any bribe payments.

3

The Cooperating Witness knew of Mr. Aguinaga's generous heart for the community and used that information to draw himself close to Mr. Aguinaga and the community's needs.  (*See* Exhibit A). The Cooperating Witness encouraged Mr. Aguinaga to accept money for various charitable and non-profit organizations, and Mr. Aguinaga did so.  The Cooperating Witness also drew himself close to Mr. Aguinaga when Mr. Aguinaga was going through a divorce and vulnerable to the need to feel appreciated and loved.  (*Id*.).

Second, the payments were only from one contractor – the Cooperating Witness.  This offense does not involve a public official that went out and made a practice of accepting bribes from multiple contractors. Instead, this offense only involves the one Cooperating Witness.  This fact highlights the limited role Mr. Aguinaga played in the offense and emphasizes that, but for the Cooperating Witness, Mr. Aguinaga likely would not have accepted payment. Moreover, such a low-level role makes it virtually impossible for Mr. Aguinaga to provide "substantial assistance" pursuant to U.S.S.G. 5K1.1 and take advantage of sentencing reduction incentives for defendants who assist in the investigation or prosecution of another person committing a criminal offense.

Third, the payments were not exclusively for Mr. Aguinaga. Many of the payments were designated for an unnamed co-conspirator. Moreover, the payments made to Mr. Aguinaga were primarily dedicated to non-profit and charitable causes. This is entirely consistent with many of the letters of support that describe Mr. Aguinaga's efforts to support the needy and raise funds for charitable organizations and non-profits. (*See e.g.* Exhibit CC, "I have known Louie for over 30 years and would like to say that I am saddened by the mishaps, I don't believe that anything here was intended for personal gain." *See also*, Exhibit GG, "Louie has always been a hardworking, dependable, and kind hearted person. He is almost too giving to a fault." *See also*, Exhibit XX, "I hope you take a special notice in his case and realize

4

1    that [Mr. Aguinaga] was not a flashy man or did things for selfish reasons; instead
2    he gave everything back to his community.)

3

4    **B.   Mr. Aguinaga's Personal and Professional History and Characteristics**
          **Form the Basis for a Downward Variance from the Advisory Guideline**
5         **Sentencing Range.**

6

7         **(i)     Mr. Aguinaga's Personal History and Characteristics**

         Mr. Aguinaga has openly accepted responsibility and expressed his remorse to
8
    the community.  He admitted guilt and signed a plea agreement before the
9
    government went through the trouble of formally charging him by indictment. In his
10
    letter to the Court, Mr. Aguinaga explains:
11

12            I take full responsibility for my actions….I was introduced to the
              cooperating witness, during a time in my life when I was going through
13            a bad time due to a recent divorce. At that time, the cooperating witness
              would come around often, and along with a fellow council member,
14            would take us out for drinks. During this time, my family life was in
              turmoil, so I turned to alcohol to get by. As time went on, I noticed that
15            the cooperating witness would often show up, uninvited, to events that I
              was involved in or hosting, offering contributions to assist in fund
16            raising pretending to show interest. It seemed strange, but I didn't give it
              much thought. This is not an excuse, but after self-examination and
17            reflection, retracing my steps, I now realized that I let my guard down
18            and allowed my integrity to be compromised. For this, I am truly sorry.
19
20   (Exhibit A).

21        Regarding Mr. Aguinaga's genuine remorse, self-reflection and acceptance of

22   responsibility, a family friend wrote, "Louie has made mistakes, and he is incredibly

23   remorseful, and is willing to do whatever it takes to make reparations, financially and

24   emotionally, if possible." (*See* Exhibit E).   Another supporter writes: "While I don't

25   condone what has happened I have spoken with Louie and he regrets what he has

26   done, knowing it was wrong and he wants to move forward with his life." (*See*

27   Exhibit N). Additionally, a family friend also wrote:

28
                                              5

> "I understand the trouble Louie is in because he has shared and admitted his wrongdoing. He has expressed regret of his actions and the pain he has imposed on the City and citizens of South El Monte and of course his family."

(Exhibit P).  Another supporter explains:

> "My entire family is dedicated to supporting Louie and his journey to rehabilitation.  He will always remain a friend who can count on us as we can count on him."

(Exhibit TT).

With full knowledge of his guilty plea in this case, Mr. Aguinaga's supporters describe the current conduct as outside of his character. Community members write: "the charges against him strike me as a completely uncharacteristic aberration." (*See* Exhibit HH).  Family, friends and members of the community continue to view Mr. Aguinaga as a man of "integrity," "noble character," "high values," who is "committed," "empathetic," "courteous," "compassionate," "polite," "loyal, respectful, considerate, hard-working and honest." (*See* Exhibit J, M, HH).   One community member described the sentiment that appears to be consistent amongst all of the letters, "[t]his corruption incident does not define Louie as a man or as a human being." (*See* Exhibit PP).

Supporters also describe Mr. Aguinaga's life-time of altruistic service. One South El Monte resident stated, "Louie loved to give, give, give; he never liked to see his community without." (*See* Exhibit DD).  A family friend wrote: "He is the most humble and giving man I know." (*See* Exhibit U).   A South El Month resident wrote: "he is always thinking of others before he thinks of himself." (Exhibit BB). A family friend stated, "He puts himself second and gives what he has with humbleness." (*See* Exhibit I). A small business owner wrote, "He's always willing to help unconditionally." (*See* Exhibit OO).  A retired pre-school teacher and police department volunteer wrote, "he is considerate, kind, caring, and has empathetic feelings for us when in need.  He is always able and available for help if you ask or

6

even if you didn't." (*See* Exhibit II).   Another family friend describes him as "a genuine man with a heart of gold and only wants to give back to the community he came from." (Exhibit AA). A resident of South El Monte for over 50 years described him as "all heart." (*See* Exhibit QQ). His former wife described the many community events Mr. Aguinaga was involved in and explains,

> "He helped a local homeless family find shelter and food for a few days, he helped local youth organizations go to competitions, he and a group of friends helped a neighborhood family cut down a tree because it was too dangerous and they could not afford a professional, he's done so much more it's impossible to list. All this he did I know it was from his heart and not for money in his pocket."

(*See* Exhibit B).

Mr. Aguinaga's notable activities also include giving time, talent and money to local organizations such as South EL Monte National Little League, South El Monte AYSO, South El Monte High School, South El Monte Vibe Cheerleaders, South El Monte Jets Pop Warner Football, Epiphany Catholic School Youth organizations, and Epiphany Catholic Parish.  His supporters discuss a variety of incidences where Mr. Aguinaga generously delivered holiday baskets to needy families, organized toy drives for needy children during the holidays and prepared pancakes for community Easter events. (*See* Exhibits I, M, Q, T, BB, and SS).  Many supporters have also written to describe his support for senior citizens at a local senior citizen center on Mother's Day, Father's Day, luncheons, bingo, and monthly excursions. (*See* Exhibits I, L, M, O, II, KK, MM, OO, and PP). A community member provided a letter for the court stating, "Louie has always been the kind of person to volunteer his time and talent with a smile." (*See* Exhibit H).   The President of the South El Monte National Little League echoed that sentiment. He wrote:

> "I have personally worked side by side with Louie during his Christmas food drive for the needy families in South El Monte. For three months prior to the holiday he donates countless hours calling on groups and businesses promoting the food drive, collecting can food and turkeys for the food baskets. All of these hours at no pay or compensation of any type."

(Exhibit N). A local business owner also wrote:

> "Not only did he initiate such programs as free thanksgiving baskets for the underprivileged, bike rides throughout the City in an effort to raise obesity awareness but he also deeply cared for every individual who sought his help. He would go above and beyond to make sure people were treated fairly and always had access to resources.

(Exhibit Q).

Mr. Aguinaga has also been an active member of Epiphany Catholic Church as a parishioner and volunteer for many years.  One supporter writes,

> [Mr. Aguinaga] has donated countless hours of volunteer service to the church. I had the pleasure of working closely with him for 21 plus years as an employee of Epiphany. Mr. Aguinaga has always been polite and very easy to work with. He always greeted me with respect and always had words of encouragement during difficult times."

(Exhibit G). Another parishioner writes:

> "In the time that we have known him, he has always been an active parishioner at Epiphany Catholic Church and School, always spending hundreds of hours organizing the annual fiesta, among other activities throughout the year."

(Exhibit LL).  Another parishioner wrote:

> "My children attend a local school in the community (Epiphany Catholic School) and I am a member of the PTO Board at the school. The school has many annual fundraisers and events and at all these functions you would see Louie there volunteering his time to help out...Louie was there from beginning to end to help with set up, tear down and all the activities in between."

(Exhibit PP).

Mr. Aguinaga has also been active in community sporting events with his daughters. In these sporting events, he served as coach, assistant coach, driver, mentor, supporter, fundraiser, snack shack employee and preparing the fields and cleaning up trash after games. (*See* Exhibits C, G, H, M, N, O, P, T, SS, TT, UU, and VV). Mr. Aguinaga's eldest daughter writes:

> "my dad coaches a softball team every year at our local park where my sisters and I all once played and currently my youngest sister plays. My father and I have coached together for the past 5 years where we teach sportsmanship, teamwork, and love for the game into young minds."

(Exhibit UU). Another supporter writes,

> "For many years, he coached our daughters' softball teams, showing nothing less than fairness and excellent sportsmanship. Not only was he a great coach, but also a great role model for the kids he worked with."

(*See* Exhibit H). The Past President of the Little League wrote:

> "Louie has been a great mentor to our youth not only as mayor of the city of South El Monte but as a member of our staff a parent and manager."

(Exhibit P).  A parent of one of the softball team members wrote:

> [Mr. Aguinaga] would volunteer for events to better the league and spent many hours on the field coaching and instructing...anyone's children who needed the extra support...he could often be seen checking up on the state of the field['s] landscaping and field maintenance, he truly loves making sure the park facilities are well maintained and cleaned for the community."

(Exhibit TT). Finally, a member of the softball team wrote: "[Mr. Aguinaga and another father] coached our softball team together and made it the most memorable years of my life." (Exhibit Y).

### *(ii)    Mr. Aguinaga's Professional History and Characteristics*

Despite struggling with a learning disability (*see* PSR at ¶ 66) and never graduating from high school (*id.*), Mr. Aguinaga has had a strong history of professional achievements that the Court should consider at sentencing. As a young man, Mr. Aguinaga purchased real estate and has become a successful property owner and landlord. (PSR at ¶70).  He has used his skills in carpentry and plumbing to repair his own properties.  His tenants praise him and describe his generosity in providing them an inexpensive place to live during a difficult time in their lives. (*See* Exhibit PP). A family friend also notes that he would use his skills to gratuitously help seniors with repairs like "changing water heaters, sinks, faucets, door knobs, remove trees from their property, and with removing the clutter from their yards." (*See* Exhibit I).

9

From 1997 to 2005, Mr. Aguinaga was employed by *Servo Products*, as an inspector and machine shop manager. (PSR at ¶67 and ¶69).  In 2005, he became the owner of a similar business. (*Id.*)  A local business owner states, "He has always been honest and a well-respected business owner." (*See* Exhibit D).  Another small business owner wrote:

> "As a small restaurant owner I have always felt Louie cares about our entire community...the small businesses...the schools...the sports organizations...the senior citizens and the youth of our community."

(Exhibit OO).

From 2003 through August 2016, Mr. Aguinaga served the City of South El Monte, first as a Councilman and later as the Mayor. (PSR at ¶68). As illustrated by the letters of support from people with full knowledge of what Mr. Aguinaga has pleaded guilty to, the citizens of South El Monte continue to support and love Mr. Aguinaga. For example, residents wrote:

> "Louie has done great things as Mayor of the City of South El Monte for the better of the community. The streets look clean, new constructions have gone up, new parks (Mary Van Dyke & Skate Park) were built for the kids, businesses and restaurants for the benefit of the community and the City. The City looks greener because new planters have been added in the middle of major streets. If any resident wakes up to graffiti on their property it is fairly promptly removed. There are events for the city residents such as "Concerts in the Park," "Movies in the Park," 4th of July celebrations and honors to Veterans, etc. Louie is always present during these events. He brings the community together to fun, family-oriented events. He made the City of South El Monte prosper."

(Exhibit K).  A group of over 100 residents signed a letter to the Court explaining:

> "Mr. Aguinaga possesses interpersonal skills, cares for the elderly, listens and tries to resolve their problems. He is a very loveable, intelligent, compassionate, friendly individual and who is present at all Senior Special events and holiday ceremonies."

(Exhibit L).  Additionally, the South El Monte Fire Captain commented on Mr. Aguinaga's service to the City of South El Monte. He wrote:

10

> "Whether...an emergency incident or community event, Louie was always the consummate professional....I truly believe the city of South El Monte and its citizens have...enjoyed a higher living standard under Louie's leadership and stewardship.  Louie is a passionate individual who deeply and sincerely cares for the people...Louie is the epitome of family, friend and neighbor."

(Exhibit NN). Finally, the President of the South El Monte National Little League wrote:

> "While working alongside Louie I have found him to be a caring and loving person who loves the City of South El Monte and its residents. He has been the most popular councilperson in the history of the City of South El Monte, he received the most votes of any person running for office in the history of the city. In his last two council races he ran unopposed, no one has ever been this popular with the residents."

(Exhibit N).

### C. A Sentence of Probation That Includes Home Incarceration and Community Service Would Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence To Criminal Conduct.

This Court has considerable discretion to fashion the terms of probation so as to meet fully the statutory purpose of sentencing by including home incarceration and a significant number of community service hours that directly relate to preventing others from committing the same or similar offense. *See* 18 U.S. Code § 3563 - *Conditions of Probation* (Listing and describing the 9 mandatory conditions of federal probation and 23 discretionary conditions). By statute, the conditions of probation may involve "deprivations of liberty or property as are reasonably necessary for the purposes indicated in [18 U.S.C.] section 3553(a)(2)." 18 U.S.C. § 3563(b).[1]

---

[1] While undersigned counsel does not view it as necessary in this case, the Court can also include a condition of probation requiring the Mr. Aguinaga to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time,

11

1    For example, because the guideline range is 46 to 57 months in prison, the

2    Court could impose a community service requirement of 4,600 to 5,700 hours to be

3    completed over an average of approximately 100 hours per month for a probationary

4    term of 60 months. *See* 18 U.S.C. § 3563(b)(12) (permitting the imposition of

5    community service as a condition of probation); *See also*, 18 U.S.C. § 3561(c)(1)

6    (permitting a 60 month probation sentence in Class C felony cases).  Based on the

7    facts and circumstances of this case, such a sentence would be a significant

8    deprivation of liberty, reasonably related to the offense, reflect the seriousness of the

9    offense, promote respect for the law, provide just punishment for the offense, and

10   afford adequate deterrence to criminal conduct. *See e.g., Gall v. United States*, 128 S.

11   Ct. at 595. (Supreme Court affirming a sentence of probation and emphasizing that

12   although a sentence of probation is certainly less severe than imprisonment,

13   "[o]ffenders on probation are nonetheless subject to several standard conditions that

14   substantially restrict their liberty.")   Moreover, community service is particularly

15   appropriate in this case because Mr. Aguinaga has a strong history of service, he is

16   amenable to the conditions of home confinement and community service, and he has

17   a wide variety of community organizations and churches that would love to accept

18   his service.

19   Furthermore, the punishment to Mr. Aguinaga has already been serious. Mr.

20   Aguinaga has been punished by the loss of his job in public office, restrictions on the

21   type of employment that he can have, his voting rights, his ability to possess a

22   firearm and public shame associated with the guilty plea and conviction.  The term of

23   probation also provides just punishment because it is Mr. Aguinaga's first conviction

24   and the offense did not involve violence or the threat of violence.  Further, based on

25

26

27   totaling no more than the lesser of one year or the term of imprisonment authorized
     for the offense, during the first year of the term of probation or supervised release;"

28   18 U.S.C. § 3563(b)(10).

12

1  the characteristics of the offense, such a sentence would also serve as adequate

2  deterrence for other elected officials.

3      In its sentencing papers, the government argues that "a 46-month sentence is

4  reasonable because it reflects the seriousness of the offense," (Gov. Sent. Pos. at 8,

5  line 7). However, it does not mention the above mitigating factors and offers none of

6  the required sentencing analysis regarding the unique circumstances of the offense.

7  Its only justification is to mention that the defendant is an "elected official who set an

8  example for many others in so many ways." (Gov. Sent. Pos. at 8, lines 17-18).

9  Significantly, it ignores that Congress has made it clear that in determining the length

10 of imprisonment, it should be kept in mind that "imprisonment is not an appropriate

11 means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a).

12      Indeed, it is unfortunate that Mr. Aguinaga's above-described life of altruistic

13 service was distracted by the Cooperating Witness offering to fund charitable causes

14 in exchange for favorable consideration on government contracts.  While the

15 government has offered no evidence that the payments actually influenced Mr.

16 Aguinaga's decisions, Mr. Aguinaga knew he was wrong when he accepted the bait,

17 and he offers no excuses. (*See* Exhibit A).  Under these circumstances, it is

18 impossible for this Court to reach a fair conclusion regarding the sentence if it relies

19 solely on Mr. Aguinaga's status as an elected official and ignores the above-

20 mentioned mitigating factors. Instead, when all of the factors are fairly weighed, a

21 sentence of probation with conditions of home incarceration and community service

22 is sufficient and no greater than necessary to meet fully the statutory purpose of

23 sentencing.

24 //

25 //

26 //

27

28

13

1

2

### D. A Sentence of Probation That Includes Home Incarceration and Community Service Would Address The Need for the Sentence Imposed to Protect the Public From Further Crimes.

3

4       Mr. Aguinaga is a non-violent individual with a low risk of recidivism. The

5   Sentencing Commission study "*Measuring Recidivism: The Criminal History*

6   *Computation of the Federal Sentencing Guidelines," A Component of the Fifteen*

7   *Year Report on the U.S. Sentencing Commission's Legislative Mandate* (May 2004)[2],

8   provides a number of statistics that support a probationary sentence in this case.

9   "Recidivism rates decline relatively consistently as age increases." (*Id*. at. 12).  After

10  age 40, recidivism rates drop dramatically.  (*Id*. at  28). Mr. Aguinaga is 49 years old

11  and, therefore, he has a statistically low risk of recidivism.

12      Mr. Aguinaga has zero criminal history points, so he is among those least

13  likely to recidivate.  This fact is supported by another useful study put out by the

14  Sentencing Commission entitled, "*Recidivism and the First Offender, A Component*

15  *of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*

16  (May 2004).[3]  This study provides data that is useful for examining an appropriate

17  sentence here:  "All offenders with zero criminal history points have a primary

18  recidivism rate of 11.7 percent."  "This zero point offender rate is substantially lower

19  than the recidivism rates for offenders with only one criminal history point. (22.6%),

20  or for offenders with two or more points (36.5%) combined in the CHC II though

21  CHC VI." (*Id*. at 13-14).

22      Thus, a sentence of probation that includes a term of home incarceration

23  would be appropriate to protect the public from future crimes when considering Mr.

24  Aguinaga's law-abiding conduct throughout his life, his compliance with Pretrial

25  ────────────────

26  [2] The report can be found online at
    http://www.lb5.uscourts.gov/ArchivedURLs/Files/08-10643(1).pdf

27  [3] The report can be found online at
    http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

28  publications/2004/200405_Recidivism_First_Offender.pdf

release conditions, his age, the non-violent nature of the charge and conviction in this case, his honorable service to his community, and the embarrassment and shame this case has brought to Mr. Aguinaga and his family.

### E. A Sentence of Probation That Includes Home Incarceration and Community Service Will Address the Need for the Sentence Imposed To Provide Mr. Aguinaga with Needed Medical Care in the Most Effective Manner.

Mr. Aguinaga suffers from Type II diabetes (PSR at ¶ 53), kidney disease (PSR at ¶ 54), polyps or possible tumors in his colon (PSR at ¶ 53), possible aneurism in the arteries of his liver and kidneys (PSR at ¶ 53), anxiety and long term-memory loss (PSR at ¶ 59) and long-term attention deficient disorder and possible dyslexia (PSR at ¶ 60).  These conditions are being monitored by his doctors and controlled by a combination of medications. (PSR at ¶ 58). He has also expressed an interest in treatment for alcohol abuse, motivated by excessive alcohol use during the time of his divorce and when he met the Cooperating Witness in this case. (PSR at ¶ 61 and ¶ 64).

A term of probation that includes house arrest and community service would permit Mr. Aguinaga to maintain his current medical treatment plan while serving his sentence.  The term can also include a balance of alcohol abuse treatment that addresses Mr. Aguinaga's response to stress and anxiety.

### F. A Sentence of Probation That Includes Home Incarceration and Community Service Will Allow Mr. Aguinaga to Continue to Be A Father to His 10-Year-old Daughter and Continue Caring for His Aging Mother-in-Law.

Mr. Aguinaga has five children – two biological daughters and three step daughters (PSR at ¶¶48-49).  He is actively involved in all of his children's lives, including his 10-year-old daughter that lives with him. (PSR at ¶49).   His daughters have provided letters to the Court explaining how Mr. Aguinaga taught them to be

15

1  "bold, strong, loving, sensitive, unselfish, religious [and] caring" women who "build

2  strong friendships and foundations." (*See* Exhibits UU and VV).  One of his

3  daughters describes Mr. Aguinaga as "the light of each room and the laugh in

4  everyone's smile." (Exhibit VV.)  His wife describes him as "a great father figure"

5  and explains that "[a]s a husband I can say he has taught me respect, unity, and the

6  love for family." (Exhibit WW). His former wife describes Mr. Aguinaga as "100%

7  all around father". (*See* Exhibit B).

8  The community and family friends also recognize Mr. Aguinaga as a

9  dedicated father. A family friend explains:

10  "Luis is a great father figure for his children, family and friends.  He sets
    an example of strength, compassion, courage and fortitude.  He is always

11  there with his love and understanding."

12  (Exhibit JJ). Other residents explain that he is "immensely dedicated to his family"

13  and that "his wife and girls mean the world to him." (*See* Exhibits W and II). Still

14  others write how Mr. Aguinaga served as a father figure to fatherless children in the

15  community. (*See* Exhibit QQ).

16  A sentence of probation with a period of home incarceration would serve the

17  added benefit of allowing Mr. Aguinaga to continue to be actively involved with the

18  responsibility of raising his 10-year-old daughter and caring for his aging mother-in-

19  law.  Mr. Aguinaga's wife explains:

20  My youngest [daughter], now ten years old, looks at him as the father
    who has always been supporting her in all her school events and sport

21  activities. Always makes sure to coach and be there at every practice.
    He has always supported me in taking care of my mother, we have to

22  take care of her on a daily basis since she can not be left alone anymore.
    My work schedule is not flexible, and I can not be leaving work to take

23  my mother to her doctor appointments, let alone miss a work day to stay
    with her when she is not doing well.  Louie handles all of this while I

24  am working.  He stays on top of her appointments, picks up my
    daughter daily from school, helps her with her homework, gives my

25  mother her medicine, and takes care of all the family errands that need

26  to be done.  This being my only source of income I can not afford to

27  lose this job, and he has become a great help to my family and I.

28

16

1  | Without his help it would be very difficult for me to attend to my sick
   | mother and watch after my daughters.
2  | (*See* Exhibit WW).

3
4  ### G. In Determining the Kinds of Sentences Available, Probation That
   | Includes Home Incarceration and Community Service is an Available
5  | Sentence.

6  Because the offense is a Class C felony, the Court can impose a sentence of
7  probation. (*See* 18 U.S.C. § 3561(c)(1); *see also*, PSR at ¶ 83). As discussed above,
8  Mr. Aguinaga would be an excellent candidate for community service and a person
9  suitable for home confinement. The government argues that "Given the nature and
10 circumstances of defendant's offense as an elected official who accepted bribes, any
11 sentence that does not involve some significant period in custody would not be
12 appropriate here." (Gov. Sent. Pos. at 9, lines 15-18). Yet it fails to mention the
13 availability of probation as an available sentence or offer any analysis under the
14 factors of 18 U.S.C. §3553(a) to explain why a sentence of probation that includes a
15 period of home incarceration and community service would be inappropriate.

16 Indeed, a sentencing analysis that fails to consider the availability of a
17 reasonable sentence such as a term of probation may induce fear and distrust of the
18 law, but not promote respect for the law. Here, because probation is not prohibited by
19 statute, it is an available sentence that the Court should consider.

20
21 ### H. A Sentence of Probation That Includes Home Incarceration and
   | Community Service Will __NOT__ Create a Sentencing Disparity.

22 Finally, the government argues that the 46-month sentence will avoid
23 unwarranted sentencing disparities. (Gov. Sent. Pos. at 8, line 23).  Yet the
24 government offers no evidence of an unwarranted sentencing disparity that would
25 prevent this court from conducting an individualized assessment of the facts
26 presented and imposing a sentence of probation in this case.  Moreover, it fails to
27 discuss or mention a single case that supports its position. Instead, it cites *Gall v.*
28 *United States* 128 S. Ct. 586 (2007) and argues that "one way" of examining

1  sentencing disparity is to calculate the guidelines. (Gov. Sent. Pos. at 8, line 26).

2  Ironically, the Supreme Court in *Gall* approved exactly what Mr. Aguinaga is asking

3  the court to do in this case and rejected the government's suggested "mathematical

4  approach" of just relying on the guidelines.

5       In *United States v. Gall*, 128 S. Ct. 586 (2007), the United States Supreme

6  Court approved as reasonable the district court's downward variance to probation in

7  a case even though the sentence was significantly below the guideline range of 30 to

8  37 months. While acknowledging that the district court varied downward

9  significantly, the Supreme Court rejected a "mathematical approach" that would look

10  at the percentage reduction because "a sentence of probation will always be a 100%

11  departure regardless of whether the Guidelines range is 1 month or 100 years." *Id*. at

12  595. While acknowledging probation as a sentence, where it is not prohibited by

13  statute, the Supreme Court instructed sentencing courts to "not presume that the

14  Guidelines range is reasonable," but instead to make an "individualized assessment

15  based on the facts presented." *Id*. at 596-97.[4]

16       Here, when examining the facts presented, a sentence of probation does not

17  result in an unwarranted sentencing disparity. Instead, the sentence is a result of an

18  individualized assessment of the facts presented that considers all of the available

19  sentences and balances the statutory purpose of sentencing.

20  //

21  //

22  //

23

24  [4] Sentencing data also show that it would be inappropriate to solely  rely on a
calculation of the guidelines to determine whether an unwarranted sentencing

25  disparity exists. For example, in fraud cases governed by § 2B1.1 in fiscal year 2014,
judges through the United State sentenced below the range in 43% of all cases in

26  which the prosecutor did not seek a substantial assistance or fast-track departure. *See*

27  U.S. Sent'g Comm'n, *Sourcebook of Federal Sentencing Statistics* tbl.28 (2014)
(2,993 out of 6,963 cases).

28

18

## IV.   CONCLUSION

Therefore, Mr. Aguinaga respectfully requests the Court to impose sentence of probation that includes home incarceration and community service as a fair and reasonable sentence in this case.


DATED:  January 9, 2017                    Respectfully submitted,


                                           _____/s/_____
                                           PETER JOHNSON
                                           Attorney for Defendant LUIS AGUINAGA


                                           _____/s/_____
                                           ARTHUR BARENS
                                           Attorney for Defendant LUIS AGUINAGA

19