EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RUTH C. PINKEL (Cal. Bar No. 164470)
Assistant United States Attorney
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6077
    Facsimile: (213) 894-7631
    E-mail:    ruth.pinkel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>LUIS AGUINAGA,<br><br>        Defendant. | No. CR 16-0521-FMO<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT LUIS AGUINAGA'S SENTENCING POSITION; DECLARATION OF RUTH C. PINKEL; EXHIBITS<br><br>Sentencing Date:  March 2, 2017<br>Time:           2:30 p.m.<br>Location:      Courtroom 6D, 1st Street Courthouse |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Ruth C. Pinkel, hereby files its response ("response") to defendant Luis Aguinaga's sentencing position.

    This response is based upon the attached memorandum of points and authorities, the Declaration of Ruth C. Pinkel, and the exhibits attached thereto, the files and records in this case, the

Presentence Report, and such further evidence and argument as the Court may permit.

Dated: February 14, 2017          Respectfully submitted,

                                              EILEEN M. DECKER
                                              United States Attorney

                                              LAWRENCE S. MIDDLETON
                                              Assistant United States Attorney
                                              Chief, Criminal Division

                                                   /s/
                                              RUTH C. PINKEL
                                              Assistant United States Attorney

                                              Attorneys for Plaintiff
                                              UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION AND SUMMARY OF ARGUMENT**

In his sentencing position (CR 28), defendant requests an extraordinary 12-level downward variance while making numerous factual claims which are inconsistent with the factual basis, and are reminiscent of someone not actually accepting responsibility, who now seeks to minimize his behavior.  More particularly, defendant claims there are alleged mitigating factors warranting a large variance, and essentially argues the entire bribe scheme was the fault of the Cooperating Witness (CW) because he allegedly took advantage of the fact that defendant wanted to donate money to charity, CW instigated the bribe payments and in any event, defendant simply donated the funds to charity.  (Defendant's Sentencing Position ("Def. Pos.") at 1.)  Defendant also submits over 48 letters of support from citizens of South El Monte, family members and business owners, purporting to attest that defendant's bribe scheme was just an "aberration" for a man with allegedly strong moral character, who is an exemplary elected official, who has given much support to local youth sports and charities.

In truth, defendant's story is one of power and prestige obtained through corrupt means.  Defendant's conduct was fueled by his ego, greed, and need for adulation.  Despite his claims of altruism, defendant's true intent can be discerned by his knowledge and behavior during the bribe scheme.  Due to his ethics training as a City official, defendant knew he was required to report cash donations on his public disclosure forms even if he donated them to charity. (6/18/2014 Transcript, attached as Exhibit 1 ("Exh.") at bates 432-33.)  Nonetheless, he admitted to the FBI that he used a

good percentage of the bribe proceeds for his personal expenses and it is undisputed that he did not report the bribes.[1]  Although defendant's story varied with each telling, the truth likely lies closer to what he admitted when first confronted by the FBI in June 2014, that almost one-half of the bribe proceeds were used for his own expenses (Exh. 1 at 406); in 2015 he would only admit <u>at least</u> 10% were used for his own expenses (10/2/16 Transcript, Part 2, attached as Exh. 3 at 466-467), and now, to minimize his conduct, he appears only willing to admit it was far less.

Defendant's method of bribe collection also shows a man with a nefarious purpose.  The bribes, consisting of cash, were slipped into the door pocket of cars (both defendant's and CW's), left in the restroom of the South El Monte City Hall or the Ramada Inn, or were given to him through another public official.  (Exh. 1, bates 388, 405.)  After he used cash for his own expenses, he passed off the bribes as his own charitable contributions, thus enhancing his reputation within the community. (<u>Id</u>., bates 400-401.)

The bribes/charitable payments not only enhanced defendant's reputation, but fed his ego.  Defendant admits "[t]he gratification that I felt being able to come through [with donations], gave me a sense of invincibility, which led to a higher likeability and acceptance in the community.  It fed my ego and I wanted more of their approval."  (Exh. A, CR 28-1 at 2.)  If defendant's motives were pure, he would have told CW to donate directly to the charities.

---

[1] Defendant admitted accepting at least $45,000 in bribes based upon the government's evidence of bribes received in 2011-2012.  <u>See</u> Exh. 4.  Since the government does not have evidence of the precise amount of bribe payments defendant received from 2005 to mid-2011, the true total is likely much higher.

2

However, defendant's motives were not pure as evidenced by the fact that he accepted bribes for seven years and happily accepted the credit for his "generosity." Defendant's donation of illicit proceeds to charity undermined the community about which he claims to care.

Finally, defendant's behavior in accepting his final bribe from CW in September 2012 shows sophistication and criminal intent of someone conscious of how criminal his conduct appeared. Defendant was nervous because he knew that Cudahy city officials had recently been arrested for taking bribes, so defendant, who had just been offered a bribe, typed out on his cell phone that CW should stop talking. (PSR ¶ 14.) Defendant, who also asked CW if he was wearing a wire, asked CW three times to accompany him to the bathroom where defendant took $2,000 in FBI undercover funds. (Id.) Defendant engaged in this suspicious conduct in the wake of another local bribery scandal knowing he was committing a crime and wanting to ensure there were no witnesses to the payoff.

The letters from defendant's constituents should be given little weight in determining an appropriate sentence as expressions of gratitude to a politician should not play any significant role in a sentencing decision. See United States v. Vrdolyak, 593 F.3d 676, 683 (7th Cir. 2010).

The facts and circumstances of defendant's crimes and an analysis of the 3553(a) factors warrant a sentence of 46 months' imprisonment, $2,000 restitution to the FBI, a three-year term of supervised release, a $10,000 fine, and a special assessment of $100.

**II. ARGUMENT**

**A. Defendant Admitted He Used Bribe Money On His Personal Expenses Including to Buy Gas and Pay for Restaurant Meals for His Friends and Family; Defendant Donated Bribe Proceeds to Charitable Events to Enhance His Reputation in The Community**

Defendant asserts that he gave away <u>all</u> the bribe money to charitable organizations and that this excuses his conduct.  He also claims, for the first time, that the CW knew that community needs were at the forefront of defendant's mind and used this to persuade defendant to accept funds for charitable purposes.  (Def. Pos. at 1, 3-4.)  Defendant seems to both back away from acceptance of responsibility <u>and</u> from his earlier admissions about how much of the money he spent on himself.

In reality, defendant did use the bribe money on himself; it was not all used for charitable purposes.  The scheme was years-long and defendant admits that his acceptance of bribes, which he passed on to charities, was not entirely altruistic.  Defendant admits the donations gave him "a sense of invincibility, which led to a higher likeability and acceptance in the community.  It fed my ego and I wanted more of their approval."  (Def. Pos., Exh. A, CR 28-1 at 2.)

When first interviewed by the FBI in June 2014, defendant admitted that "[o]n the cash payments. Like I said. More than half always went to somebody else. To nonprofits. To friends. To you know."  (Exh. 1, bates 406.)  Roughly translated, approximately one half of the bribe payments <u>were</u> kept by defendant.  During that interview, defendant admitted he spent some of the bribe money on gas for his car and for restaurant meals. (Exh. 1, bates 403.)

Sixteen months later, when interviewed by the FBI and an Assistant U.S. Attorney, defendant back-tracked considerably claiming

4

he used "at least 10%" on his own expenses including gas, trips to McDonalds, Burger King and Chiles restaurants.  (Exh. 3, bates 466-467.)[2]

With respect to his current claim that CW took advantage of him and the fact that defendant wanted to donate money to charity, there is no evidence to support this claim.  Notably, when defendant was interviewed by the FBI in 2014 and 2015, he never said this to the FBI.  In fact, he said he could not remember how the bribe payments started.  (Exh. 1, bates 418-419.)  In any event, this is the adult equivalent of claiming "he started it," which does not mitigate defendant's conduct.

**B.  Defendant's Letters of Support Have Little Bearing in Determining a Reasonable Sentence**

Defendant argues his history and characteristics justify a significant downward variance.  (Def. Pos. at 5-11.)  However, below the surface of these arguments you see a politician asking for extra credit both for his political work and because he used some bribe money to support the community.  These are not valid bases for a probationary sentence.

As support, defendant submitted approximately 48 letters from citizens and business owners of South El Monte.  The letters have a general theme attesting to defendant's service to the City and to his contributions to youth sports programs and non-profits.  While defendant's community service is laudable, it is not an appropriate basis for a variance.  As a politician, defendant is expected to curry favor with the citizens of his City.  This is how he got

---

[2] During both interviews he admitted he knew CW was trying to get defendant's support to "stay" in the City as a contractor.  (Exh. 1, 419; Exh. 3, 465.)  This alone shows defendant was influenced.

5

elected and won re-election, by serving the needs of his community. Indeed, it is typical for politicians convicted of public corruption offenses to maintain a cadre of supporters and/or constituents who highlight the accomplishments of that public official, however, their expressions of gratitude should not play any significant role in any sentencing decision. United States v. Vrdolyak, 593 F.3d 676, 683 (7th Cir. 2010) ("Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh in sentencing.").

Similarly, praise from supporters who laud defendant's alleged charitable giving should be discounted in light of the fact that he used bribe money for those donations.  (For example, defendant is praised for his contributions by a friend who discusses a trip to Montana for a little-league all-star team and notes, "Louie and I drove our girls and along with that he made sure that our team had everything we need for the trip.  Louie always went out of his way for our girls <u>to make sure they would be taken care of.  Anything the team needed Louie Made sure we had it</u>."  (Exh. U, CR 28-1 at 48.) (emphasis added).  Another supporter says, "He was instrumental in personally reaching out to the nonprofits to enable their success." (Exh. V, CR 28-1 at 50.)  By accepting bribes for seven years, defendant engaged in a twisted version of Robin hood—taking money from a contractor doing work for the City and donating it to little league, soccer, and other non-profits. (Exh. 1, bates 400-401.)[3]

---

[3] Indeed, the charities defendant cites in his sentencing papers are the very charities to which he said he gave the bribe money. (Def. Pos. at 7 cf. w/ Exh. 1 at bates 400-401.)

6

Unlike Robin hood, who was open and notorious in his "steal from the rich to give to the poor" antics, defendant played off the donations as his own to curry the favor, support and adoration of his constituents. To now give defendant extra credit for his charitable work/donations is the equivalent of giving a downward variance to a bank robber who donates some of his haul to the Salvation Army.

Finally, letters extolling defendant's moral character lack merit when juxtaposed with a man who knowingly took bribes for years and, knowing that Cudahy city officials had recently been arrested for taking bribes, tells CW to stop talking and meet him in the bathroom to accept $2,000. (PSR ¶ 14.) Defendant's behavior shows someone both conscious that he is committing a crime and motivated to get his bribe.

### C. A Probationary Sentence Is Neither Reasonable or Appropriate Under the Circumstances of This Case

Defendant argues he is an appropriate candidate for a sentence of probation with conditions of home confinement and community service. (Def. Pos. at 2, 11-14.) This is, in effect, a request for a 12-level downward departure to Zone B of the guidelines. (U.S.S.G. 5B1.1(a)(2)). Nothing in the facts of this case or an analysis of the 3553(a) factors warrants such an extraordinary departure.

Defendant argues that his history of community service makes a sentence including community service appropriate for him and that he has already been punished by the loss of his public office, voting and other rights, and the public shame. (Def. Pos. at 12.) None of these reasons set defendant apart from other similarly situated offenders and none warrant a significant downward departure.

7

Defendant also argues that his requested sentence would serve as adequate deterrence for other elected officials. (Def. Pos. at 13.) This is simply not true. To give the mayor of a city, who accepted bribes for seven years, a light sentence such as this, would send the wrong message to other elected officials- - that there is little to risk in taking bribes.

Additionally, defendant relies on two 2004 U.S. Sentencing Commission studies on recidivism, age and first time offenders to justify his requested sentence. (Def. Pos. at 14.) However, the conclusion that aging offenders in general may be less likely to reoffend says little about this particular case where defendant began his criminal conduct in his late 30s and where that conduct went on for years, only stopping when Cudahy city officials were charged. There is little in the reports to indicate that any distinctions were made between types of offenses –white collar offenders skew older than the average drug or violent offender so the findings carry less force with respect to crimes that require less vigor.

More importantly, the 2016 Sentencing Commission report on recidivism notes that recidivism risk is just a part of a sentencing analysis. The Commission noted that "offense levels in the federal sentencing guidelines were intended to reflect multiple purposes of punishment, including just punishment and general deterrence (which are unrelated to offender recidivism)."[4] Here, just punishment for his conduct and general deterrence to defendant other public officials warrants prison time for defendant.

---

[4] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (See report at 20.) The report notes a 52.9% recidivism rate for defendants at offense level 23. (p. 20).

8

Other data gathered by the U.S. Sentencing Commission also suggests imprisonment is appropriate. In fiscal year 2015, 77.8% of the bribery defendants in this district received sentences of prison only, none received sentences of probation only, and remaining 22.2% received split sentences or probation and confinement, (which sentences were likely the result of downward variances for cooperation). U.S. Sentencing Commission Statistical Info., Fiscal Year 2015, Table 5.[5] Thus, a non-prison sentence for defendant would be a significant disparity from other defendants.

Finally, the widely held view by the public and the bench is that white-collar sentences are too lenient, mitigating against a 12 level variance. See Results of Survey of U.S. District Court Judges January 2010 through March 2010, at 13 (June 2011).[6]

**D. Defendant's Health Issues Can Be Addressed by the Federal Bureau of Prisons, Thus Provide No Justification for A Non-Custodial or Reduced Sentence**

Defendant argues that he should receive a sentence of home detention and community service so that he may address health issues, including diabetes and kidney disease. (Def. Pos. at 15.) (Defendant also mentions possible tumors in his colon, but because of the way they are described, they do not appear to be malignant.) Defendant has not raised any health issues which would justify such a dramatic downward variance. The Federal Bureau of Prisons can provide necessary health care to inmates and does so all the time.

---

[5] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2015/9c15.pdf

[6] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/surveys/20100608_Judge_Survey.pdf.

9

**E. Defendant's Desire to Care for His 10 Year-Old Stepdaughter and Aging Mother-In-Law Do Not Justify a Non-Custodial or Reduced Sentence**

Defendant justifies his desired sentence on his alleged need to care for his 10-year-old step daughter and aging mother in law. (Def. Pos. at 15-16.) He did not raise this with the PO, who would have analyzed these facts in her recommendation; under the circumstances here, these family issues are not a valid basis for a downward variance.

Most defendants have families who would like them to stay out of custody to care for them, thus defendant is not unusual. U.S.S.G. § 5H1.6 states that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." The application note further advises that:

> The fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for a departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

U.S.S.G. § 5H1.6 comment. (n.(1)(B)(ii)).

The guidelines contemplate that hardship or suffering on the part of an incarcerated defendant's family is an ordinary, albeit unfortunate, side effect of incarceration and defendant is distinguishable from the defendants who appear before this court whose wives struggle to support their children on public assistance, but still receive prison sentences. Defendant has four adult daughters, two of whom wrote letters attesting to their close relationship with him (Exhs. UU and VV), who could care for defendant's step-daughter and mother-in-law. Consequently, this claimed need to stay out of custody lacks merit.

10

<u>DECLARATION OF RUTH C. PINKEL</u>

I, Ruth C. Pinkel, declare as follows:

1. I am an Assistant U.S. Attorney in the Central District of California and am assigned to represent the government in this case. I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2. Attached hereto as Exhibit 1 is a true and correct copy of excerpts of a transcript of a June 18, 2014 interview of defendant by agents of the Federal Bureau of Investigation. These pages were produced in discovery by the government as bates numbers 329-331, 342-343, 349-350, 388, 390, 400-406, 418-419.

3. Attached hereto as Exhibit 2 is a true and correct copy of excerpts of a transcript of Part 1 of an October 2, 2015 interview of defendant by agents of the FBI and Assistant U.S. Attorney Brandon Fox, Chief of the Public Corruption and Civil Rights Section. These pages were produced in discovery as bates numbers 428-430, 441, 450-56, 462.

4. Attached hereto as Exhibit 3 is a true and correct copy of excerpts of a transcript of Part 2 of an October 2, 2015 interview of defendant by agents of the FBI and Assistant U.S. Attorney Brandon Fox, Chief of the Public Corruption and Civil Rights Section. These pages were produced in discovery as bates numbers 463-469.

5. Attached hereto as Exhibit 4 is a true and correct copy of a spread sheet showing payments made to defendant by the CW between May 13, 2011 and May 30, 2012. This spreadsheet was produced in discovery as bates numbers 481-482.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on February 14, 2017.

                                        */s/Ruth C. Pinkel*
                                        RUTH C. PINKEL